Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025
jake@blockleviton.com

*Counsel for Lead Plaintiff Luis Collazos*
*And Lead Counsel for the Class*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SEMTECH CORPORATION SECURITIES LITIGATION | Master File No. 2:25-cv-01474-MCS-JC |
| | CLASS ACTION |
| This Document Relates to:<br><br>ALL ACTIONS | **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACION COMPLAINT** |

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

# TABLE OF CONTENTS

INTRODUCTION .........................................................................................................1

STATEMENT OF FACTS........................................................................................3

ARGUMENT ...............................................................................................................6

   A. The Consolidated Complaint Sufficiently Pleads Falsity ...............................6

      1. Defendants Misled Investors that there was a Robust Market for CopperEdge ...........................................................................................................7

      2. Misstatements Paraphrased by Analysts Are Actionable.............................11

      3. Defendants' Statements Are Not Protected by the Safe Harbor ..................13

      4. Defendants' Statements Are Neither Inactionable Opinions Nor Puffery ....14

   B. The CC Pleads Facts Supporting a Strong Inference of Scienter ................16

      1. Semtech's Debt Was a Serious Threat and It Needed the December 2024 Stock Offering to Reduce the Debt .................................................................16

      2. Lin's Stock Sales Support Scienter ..............................................................18

      3. The Temporal Proximity Between the False Statements and Disclosure of the Truth Supports Scienter .................................................................................20

   C. Plaintiff Adequately Alleges Control Person Liability..................................22

CONCLUSION .........................................................................................................22

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

# TABLE OF AUTHORITIES

**CASES**

*Azar v. Yelp, Inc.*, 2018 WL 6182756, (N.D. Cal. Nov. 27, 2018) ........................... 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)......................................................... 6

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ......................... 20

*Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096 (C.D. Cal. 2012)................................................................................................................ 8

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605 (9th Cir. 2017) ................................................ 21

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151 (N.D. Cal. March 22, 2021)....................................................................... 21

*Curran v. Freshpet, Inc.*, 2018 WL 394878 (D.N.J. Jan. 12, 2018).......................... 18

*ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023 (9th Cir. 2016) ........................... 16

*Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580 (N.D. Cal. 2019) ......................................................................................................... 19

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023)................................................................................................... 6, 14, 15

*In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ........................................................................................................... 8

*In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012 (N.D. Cal. 2002) ......................................................................................................................... 11

*In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, (N.D. Cal. June 2, 2020) .......... 13, 19

*In re Apple Inc. Sec. Litig.*, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)................. 20

*In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir. 2015)..................... 12

*In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007).......................................................................................................................... 11

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

*In re Honest Co. Sec. Litig.,* 615 F. Supp. 3d 1149 (C.D. Cal. 2022) ........................ 15

*In re Illumina, Inc. Sec. Litig.*, 2018 WL 500990 (S.D. Cal. Jan. 22, 2018).............. 14

*In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal.
2007) ................................................................................................ 11

*In re Nelson*, 761 F.2d 1320 (9th Cir. 1985) ............................................... 13

*In re Nimble Storage Sec. Litig.*, 2017 WL 4355570 (N.D. Cal. Oct. 2,
2017) ................................................................................................ 13

*In re Peoplesoft, Inc.*, 2000 WL 1737936 (N.D. Cal. May 25, 2000)........................ 13

*In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923 (N.D. Cal. Aug. 10,
2005) ................................................................................................ 18

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017)............................ 13

*In re Questcor Sec. Litig.*, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).................... 22

*In re Secure Computing Sec. Litig.*, 184 F. Supp. 2d 980 (N.D. Cal. 2001) .............. 11

*In re Sona Nanotech Sec. Litig.*, 2022 WL 22879627 (C.D. Cal. Mar. 18,
2022) ..................................................................................... 6, 16, 17, 18

*In re Sona Nanotech Sec. Litig.*, 562 F. Supp. 3d 715 (C.D. Cal. 2021)...................... 6

*In re TUT Sys., Inc. Sec. Litig.*, 2002 WL 35462358 (N.D. Cal. Aug. 15, 2002)
.................................................................................................... 12

*In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725 (N.D. Cal. Sept. 14, 2021) ........... 13

*In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293 (W.D. Wash. Apr. 19,
2019)................................................................................................ 21

*In re Zoom Sec. Litig.*, 2022 WL 484974 (N.D. Cal. Feb. 16, 2022)........................ 10

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236 (10th Cir. 2022) ........ 18, 19

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir.
2022) ................................................................................................ 9

*McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652 (E.D. Pa. 2021)................ 20

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) .................................................................................................... 11

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015) ........................................................................................... 15

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598 (9th Cir. 2014) ........... 15

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) ........................................... 6

*Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............ 13, 14, 16

*Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016)............................. 9

*Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010) ................................................ 14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007)................................ 16

*Wenger v. Lumysis, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................. 11

**STATUTES**

15 U.S.C. § 78u................................................................................................. 13

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

**INTRODUCTION**

Semtech Corp.'s overleveraged condition opened the door for activist investor Lion Point Capital to appoint four directors to Semtech's Board. ¶70. Lion Point eventually named one of its chosen directors, Hong Hou, as CEO. He emphasized the "number one priority" was reducing Semtech's debt, with "all cards on the table" to drive the leverage ratio down. ¶¶75, 78, 80-81.[1]

In March 2024, Nvidia announced the development of a new GPU superchip, the GB200. Cloud service providers ("CSPs")—hyperscalers, in particular—were the primary users for the GB200, as they required server-scale computing power and sought the most powerful chips available for the intense demands of artificial intelligence. ¶¶5, 85. Nvidia initially offered three rack-scale configurations using the GB200 chip: NVL36, NVL72 and NVL36x2. ¶5. The NVL36x2—which would link two server racks for comparable computing power to the NVL72—presented a significant opportunity for a Semtech product, CopperEdge—a chip used in the production of the active copper cables ("ACC") linking the NVL36x2's two racks. *Id.*

However, public information began to surface that Nvidia was discontinuing support for the NVL36x2 configuration, and customers were not planning on using it. A market-moving tech analyst, Ming-Chi Kuo, issued a report on October 1, 2024 (the "Kuo Report") throwing cold water on the CopperEdge opportunity created by the NVL36x2 rack configuration: "Nvidia halting development of GB200 NVL36*2 (dual-rack 72 GPUs version)." *Id.* Kuo's report explained, "unless there are customized requirements, Nvidia will only offer the single-rack version of GB200 NVL72, discontinuing the dual-rack version (NVL36*2)." *Id.* This meant significantly lower demand for ACCs and the CopperEdge chip. Semtech's stock price, which had climbed above $47 per share, fell to $40 a share after Kuo issued his report. ¶12.

---

[1] Citations to "¶" are to the Consolidated Complaint ("CC") filed July 14, 2025. Dkt. 51.

- 1 -

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

Public information lent credence to the Kuo Report. On October 15, 2024, the Open Compute Project ("OCP"), a nonprofit focused on data center hardware, held its global summit attended by more than 1,400 organizations. ¶94. Analysts reported that "the two key points that all the ODMs [original device manufacturers] agreed on was that NVDA is focused exclusively on the GB200 NVL72 and cancelled the NVL36+36 [i.e., 36x2]. If the NVL36 ever does come to fruition, it won't be for a while." ¶95. By mid-November, 2024, numerous news outlets reported on the NVL36x2 cancellation, and the two largest hyperscalers—Microsoft and Amazon—announced their adoption of the NVL72 rack system.[2] ¶99.

Notwithstanding these facts, Hou and Defendant Lin denied the 36x2 system was killed and continued to tout the opportunity for the CopperEdge in the NVL36x2 configuration, claiming the opportunities went well-beyond the "floor case," first touted in June 2024, which was predicated on a single customer and use case. ¶¶122, 124, 126, 129-30, 132, 134. Their assurances caused Semtech's stock price to skyrocket above $60 per share and, importantly for Semtech's efforts to lower its debt, enabled Semtech to sell $661 million in a secondary stock offering that closed on December 9, 2024, raising 60% more than originally planned. ¶107. Hou boasted, "the balance sheet has improved tremendously. We reduced the leverage ratio from 11.2x to 2.2x, and that allows us to focus on accelerating the growth through some disciplined investment in … R&D." ¶83. Lin, who had never previously sold **any** Semtech stock, sold a sizable portion of his holdings between December 2024 and January 2025. ¶152.

Then, just ten weeks after assuring investors of the tremendous market opportunities for CopperEdge, and only eight weeks after completing the secondary offering, an analyst from Robert W. Baird & Co., one of the underwriters of the $661 million secondary offering, issued a report that "ACC benchmarking activity has been

---

[2] A month after the close of the Class Period, Google also announced its use of the NVL72. ¶119.

muted in the past few months outside of Meta," and Semtech "investors should brace for near-term turbulence." ¶23. Baird forced Semtech's hand. After the close of trading on Friday, February 7, Semtech issued a highly unusual mid-quarter update to its guidance: "sales from … CopperEdge products used in active copper cables are expected to be lower than the Company's previously disclosed floor case estimate of $50 million due to rack architecture changes, with no expected ramp-up over the course of fiscal year 2026." ¶167. Semtech's stock price plunged on these two disclosures, falling from its closing price of $60.50 on February 5 to $37.60 on Monday February 10, 2025. ¶170.

In essence, Semtech admitted that the Kuo Report had been right all along. By refuting the Kuo Report after its publication, and by disputing publicly disclosed facts, Semtech inflated its stock price just long enough to raise $661 million and solve its massive debt problem. This is quintessential securities fraud: claim there is an enormous market opportunity for your product, refute reports to the contrary, raise a massive amount of capital the company desperately needs through a stock offering with inflated stock, then admit shortly thereafter that the market opportunity does not exist.

### STATEMENT OF FACTS

In January 2023, Semtech purchased Sierra Wireless for $1.2 billion, financed with $1.15 billion of debt. ¶¶3, 60. Two months later, Semtech entered a standstill agreement with activist investor Lion Point, which secured two board seats and approval rights over two new independent directors. ¶70. Semtech subsequently replaced its longtime CEO with Paul Pickle, who the new Board tasked with reducing Semtech's heavy debt. ¶72.

By early 2024, rising interest rates drove Semtech's payment on its debt to $95.8 million, up from just $17.6 million a year earlier. ¶76. Pickle emphasized a "hyper-focus[]" on lowering leverage and assured analysts that "all cards are on the table." ¶75. By Q1 2025, the leverage ratio of Semtech's credit facility debt worsened. On the

- 3 -

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

Q1 earnings call held June 25, 2024 ("June Earnings Call"), Pickle reassured investors that Semtech was "focused on reducing the overall debt load," using "every option available to us." ¶78.

During the June Earnings Call, Pickle also discussed an "explosive" new opportunity for Semtech: the CopperEdge GN8112, a linear equalizer designed to extend the signal reach of copper cables. ¶¶58, 45. He projected a $50 million market opportunity in fiscal year 2026, solely based on what he described as a "particular program use case … one particular program"—Nvidia's Blackwell GB200 NVL36x2 rack architecture. ¶¶52, 53.

Two days later, Semtech replaced Pickle with Lion Point-appointed director Hou. ¶79. During Hou's first earnings call as CEO in August 2024, he reiterated Pickle's commitment to debt reduction and praised CopperEdge as "a purpose-built solution for Hyperscalers to address their specific challenges" and touting that "this is a sweet spot and the market is moving towards us." ¶¶¶80, 84, 86. Hou stated that Semtech expanded customer engagement with the "total opportunity" "above and beyond the floor case we guided." ¶10.

A well-known and highly regarded tech analyst, Ming-Chi Kuo, issued a report on October 1, 2024, stating that Nvidia was halting development of the NVL36x2 in favor of the NVL72, citing, among a number or reasons, "major" customer preference. ¶¶89, 90. Semtech's stock price fell from $45.66 to $40.58 over the next three days. ¶91. At the time, two major hyperscalers, Amazon and Oracle, had launched AI programs using NVL72 racks. ¶82.

Defendants sought to dispel investor concerns about the impact of this news on the CopperEdge market opportunity. On October 8, 2024, Hou and Lin joined the Benchmark Company for a fireside chat and reassured investors that Semtech engaged with contacts across the ACC supply chain and found no evidence of any changes to Nvidia program development plans. ¶52. Benchmark published Hou and Lin's

- 4 -

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

reassurances on October 10, 2024, the start of the class period, and Semtech's stock price regained its previous losses. ¶93.

On October 15, 2024, Nvidia announced it would share key portions of the NVL72 at the OCP summit. ¶94. Analysts noted, "the GB200 NVL72 will be the primary NVDA SKU (no NVL36 to speak of)," and "key points" were that Nvidia "is focused exclusively on" the "NVL 72 and cancelled the NVL 36[x2]." ¶95. Two days later, Kuo reported that Microsoft planned to acquire NVL72 units, ¶97, which Microsoft confirmed in a November 19, 2024 blog post. ¶98.

During Semtech's Q3 2025 Earnings Call held November 25, 2024, ("Q3 Earnings Call") Hou acknowledged "there have been multiple reports regarding Blackwell GPU rack designs" but he provided "assurances based on our ecosystem engagement" and "reaffirm[] our expectation of exceeding the floor case provided a couple quarters ago…." ¶100. Semtech's stock price climbed to over $63 per share after the Q3 Earnings Call. ¶17. Longtime director and former chairman of the Board, Rockell Hankin, abruptly resigned. ¶105. Two weeks later, Semtech closed on a public offering that raised $661 million dollars in gross proceeds to pay down debt, lowering the Company's debt leverage ratio from 11.2x to 2.2x. ¶¶107, 149.

Semtech continued to tout the CopperEdge "floor case" into January 2025. ¶¶132, 134. But on February 6, 2025, Baird reduced Semtech stock's price target from $80 to $60 because "ACC benchmarking activity has been muted in the past few months." ¶114. On this news, Semtech's stock price fell 10%. ¶115. After close of trading on Friday, February 7, 2025, in an unusual mid-quarter update, Semtech revealed that CopperEdge sales would not even meet the Company's $50 million floor case "due to rack architecture changes," exactly what the Kuo Reported stated and was demonstrated by major hyperscalers who adopted the NVL36x2 rack system. ¶116. On February 10, 2025, the next trading day, Semtech common stock plummeted 31% to close at $37.60 per share. ¶118.

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

**ARGUMENT**

This Court cogently set forth the pleading standards for a securities fraud claim in *In re Sona Nanotech Sec. Litig.*, 562 F. Supp. 3d 715, 722-27 (C.D. Cal. 2021). *See also In re Sona Nanotech Sec. Litig.*, 2022 WL 22879627, at *3-4 (C.D. Cal. Mar. 18, 2022).

### A. The Consolidated Complaint Sufficiently Pleads Falsity

"[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quotations omitted). Falsity is subject to a particularity requirement and the reasonable inference standard of plausibility,[3] *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023), which requires plaintiff only to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

The CC clears this bar by detailing specific facts from which the Court can reasonably infer that Defendants' statements misleadingly gave investors the false impression that the CopperEdge market opportunity remained unchanged. ¶58. In truth, Nvidia discontinued its support of the rack architecture that CopperEdge revenue "heavily depende[d]" on, ¶52, but Semtech needed to delay revealing the truth until after it successfully completed its secondary offering to reduce its crippling debt load.

---

[3] Defendants urge the Court to apply the strong inference of scienter standard to Plaintiff's falsity allegations. But the Ninth Circuit expressly warned against this in *Glazer*: merging falsity and scienter into "a single inquiry"—a framing "clearly irreconcilable" with *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). 63 F.4th at 766. It is "abundantly clear" that "we do not impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.'" *Id.*

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

### 1. Defendants Misled Investors that there was a Robust Market for CopperEdge

Immediately after the Kuo Report, the market homed in on the impact to CopperEdge revenues.[4] ¶¶88-91. Semtech had yet to solve its debt crisis so Defendants refuted the obvious implications from the Kuo Report. A week after Kuo's Report, Hou and Lin spoke to the Benchmark Company, which reported on October 10, 2024 that they had "**been unable to find any evidence of any changes to Nvidia program development plans**." ¶122.

This statement was objectively false and misleading when made. The Kuo Report made it clear there was evidence Nvidia was moving away from the NVL36x2. This was confirmed at the OCP conference and by major hyperscalers, such as Microsoft, Oracle and Amazon, who revealed they were using the NVL72 rack.

Defendants continued to assure investors that Nvidia was not discontinuing support of the NVL36x2, so the market opportunity for the "floor case" remained intact. Piper Sandler reported on October 22, 2024 that "**Hou reiterated SMTC's ACC expectations**." ¶124. On the Q3 Earnings Call, Hou emphasized Semtech's "**ecosystem engagement**" as the basis to "**reaffirm[] our expectation of exceeding the floor case provided a couple quarters ago.**" ¶126; *see also* ¶¶129-30. On January 11, 2025, Roth Capital Partners issued a note reporting that "**Mgmt. continues to underscore … Expansion above its prior $100M FY26 TAM**" and "**the ACC**

---

[4] Defendants attempts to undermine the Kuo Report fail. *First*, this is merely an attempt to refute well-pled facts, improper on a 12(b)(6) motion. *Second*, the report was credible enough to cause Semtech's stock price to decline by approximately 10% and cause Hou and Lin to specifically respond to and refute it. Plus, Defendants seek to rely on an article published by Anton Shilov from Tom's Hardware to dispute the facts, Dkt. 56-4, but Shilov himself noted that Kuo "is a reputable analyst" who "appears to have inside information on the matter." ¶88. *Third*, the CC alleges that Kuo is widely regarded for his reputability because he relies on supply-chain sources. ¶88. *Fourth*, numerous news outlets and analysts soon after reported the same conclusion and the actions from major hyperscalers confirmed Kuo's reporting (not to mention Semtech's February 7, 2025 about-face). ¶¶95-96, 99.

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

**remains on track with NVDA's Blackwell**." ¶132. And on January 21, 2025, Needham & Co. reported that "**Management remains comfortable with its floor case ACC TAM of $100M, noting it continues to be supported by one customer for one use case**." ¶134.

These statements left reasonable investors with the impression that the "specific use case," ¶10, for CopperEdge was unchanged—an impression of "a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale*, 845 F.3d at 1275. In reality, the market had embraced the NVL72, which had no use for ACCs (and therefore CopperEdge). As Kuo reported, Nvidia was discontinuing its support for the NVL36x2 due to resource constraints, NVL72's superior performance, public commitments, and "major" customer preference.[5] ¶89. Kuo's reporting was corroborated at the October 15 OCP Conference, where analysts noted that "NVDA is focused exclusively on the GB200 NVL72 and cancelled the NVL36+36," ¶95, and by hyperscaler announcements adopting the NVL72. ¶¶87, 98.[6] Plus, the Baird analyst report noted that "ACC benchmarking activity has been muted in the past few months outside of Meta," supporting the Kuo's Report's months-prior revelation of a severely limited ACC market.

The inference of falsity is further supported by Hankin's abrupt resignation— without explanation—immediately after the Q3 Earnings Call and days before the secondary offering. ¶128; *see Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1116 n.78 (C.D. Cal. 2012) (allegations suggesting resignation was caused by

---

[5] Anton Shilov, of Tom's Hardware—who Defendants attempt to rely on for reporting in January 2025 that the NVL36x2 was still viable—himself, reported on October 1, 2024 that Nvidia "is halting development" of the "NVL36x2" and that Kuo was a "reputable analyst and appears to have inside information on the matter." Decl. of Jacob A. Walker in Opp. Defs.' Request Judicial Notice Ex. A; ¶88.

[6] Defendants' claim that "hyperscalers are only one piece of the market" for CopperEdge, MTD at 12, is plainly disingenuous. Semtech itself described CopperEdge as "a purpose-built solution for hyperscalers to address their specific challenges." ¶84. Moreover, the "floor case" Defendants touted was not based on some broader market—it was for the NVL36x2 rack configurations. ¶¶6, 9, 10, 53, 58, 103, 112, 134.

- 8 -

"doubts concerning management's representations" supportive of inference of falsity); *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *28 (C.D. Cal. Aug. 8, 2013) (noting that resignation "cannot be easily discounted, as it represents strong circumstantial evidence that the 2009 annual report was not accurate"). Hankin was a Board member for 27 years and 18 years as Chairman. ¶¶18-19, 128 It is highly suspicious that he resigned, effectively immediately, without explanation, a day after Semtech's stock price soared over 20% and two weeks before a massive secondary offering that solved Semtech's debt crisis. ¶¶17-19. The reasonable inference is that Hankin took issue with Hou's statements on the Q3 Earnings Call and did not want to sign his name to the offering documents.

Moreover, the short time between Semtech's statements refuting the Kuo Report in October, Hou's Q3 Earnings Call statements, and Semtech's unusually-timed February 7 disclosure that Semtech would not meet the ACC floor case "due to rack architecture changes" also supports falsity. "It is settled precedent that the passage of just a short period of time between executives' rosy statements about their company's prospects and a downturn in those prospects is 'circumstantial evidence' that the challenged statements 'were false when made.'" *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1097 (9th Cir. 2022) (three months sufficient shortness of time). This "circumstantial evidence" should be given "more weight in view of the absence of any indication of an intervening catastrophic event." *Id.* at 1083–84.

Defendants argue that Plaintiff seeks to hold Semtech responsible for not predicting other market participants' actions. Defs.' Mot. to Dismiss ("MTD") 19, Dkt 54. But this is exactly what Semtech did: it disputed reports from reputable third parties and end users—hyperscalers—regarding the development and adoption of the NVL36x2 rack system and claimed it knew better what other market participants were going to do. Defendants, of course, could have remained silent and said nothing, but once they chose to speak, they assumed a duty to truthfully and completely disclose the

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

material details of their "engagement." *See* ¶¶102, 122, 126; *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (cleaned up). Plaintiff's allegations do not become fraud by hindsight simply because later events (Semtech's admission that the "floor case" would not be achieved "due to rack architecture changes") corroborate the earlier third- party reporting and contemporaneous public facts, which confirm Defendants' refutations were false. *See In re Zoom Sec. Litig.*, 2022 WL 484974, at *3 (N.D. Cal. Feb. 16, 2022) (falsity element satisfied where earlier third-party reporting was later confirmed by "defendants' express acknowledgment").

Defendants claim their statements emphasizing Meta's customized dual rack "Catalina" platform for the GB200 chip demonstrate the truthfulness of their statements. MTD 10, 12, 13n.4. But this is a red herring. First, it was a **customized** rack, rendering Nvidia's support irrelevant. Second, contemporaneous analyst and media reports repeatedly downplayed the significance of its presentation at OCP. *See* ¶104 (Meta press release noting Catalina was "capable of supporting up to 140kW," suggesting compatibility with the higher power demands of the NVL72); ¶95 (analyst report observing that Meta was "showing an NVL36 solution at their booth [at the OCP] but gave little details to the volumes or the prevalence of the design"). Third— and most importantly—by February, Semtech admitted its "server rack customer" had abandoned the rack architecture requiring CopperEdge, yet Meta never announced any changes to its Catalina rack architecture (nor has it since). ¶117; *see Schueneman*, 840 F.3d at 706–07.[7]

---

[7] Tom's Hardware writer Shilov wrote on October 15, 2024 that "Meta plans to contribute its Catalina AI rack architecture, based on the … NVL72 system," casting significant doubt on Defendants' fact-based dispute that Meta was using the NVL36x2. Walker Decl. Ex. B.

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

Defendants' repeated refutations of public information about Nvidia halting support of the NVL36x2 were false and misleading.

### 2.  Misstatements Paraphrased by Analysts Are Actionable

A "defendant can be held liable for false or misleading statements made by a third-party analyst if the defendant…provides the analyst with false or misleading information with the intent that the analyst will communicate that information to the market." *In re Secure Computing Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001). Attending meetings and participating in interviews with analysts is sufficient to show intent. *In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1028 (N.D. Cal. 2002). "[E]xact quotations" in analyst reports are not required. *Nursing Home Pension Fund*, *Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004). Here, Defendants challenge as inactionable statements that "clearly originated from [Semtech] and were merely reported by the third parties." *Id*. Defendants also mistakenly challenge such statements as improper group pleading, citing *In re Hansen Natural Corp. Sec. Litig.*. But unlike *Hansen*, Hou and Lin are specifically alleged to be the individuals who spoke to analysts. *See* 527 F. Supp. 2d 1142, 1153 (C.D. Cal. 2007) ("no specific allegations" that six individual defendants "played any role whatsoever" in making or disseminating any of the 17 pages of unexplained but allegedly false statements).

Defendants' authorities do not establish a blanket rule that they cannot be held accountable for misleading statements communicated through analysts. MTD 6-7. Rather, their authorities distinguish between opinionated paraphrasing, which is inactionable, and summaries of defendants' actual statements, which are actionable. In *Wenger v. Lumysis, Inc.*, the court was concerned with "impressionistic" paraphrasing, not analyst summaries of company statements. 2 F. Supp. 2d 1231, 1245-47 (N.D. Cal. 1998). The other case cited by Defendants involved a challenge to an analysts' personal opinion. *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1051 (N.D.

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

Cal. 2007) (analyst report sharing "conviction" based on "recent meetings with management" was "more akin to the statements in *Wenger*…rather than the mere reporting of defendants' actual statements as in *Oracle*"). Nothing like that is at issue here.

Here, the analyst reports involve neither "impressionistic" paraphrasing nor analyst opinion. The statements came directly from Defendants and "concern[ed] specific matters." *Wenger*, 2 F. Supp. 2d at 1247. Hou and Lin's participation in the Benchmark "fireside chat" days after the Kuo Report underscores their intent to refute his reporting through Benchmark. ¶121. Less than two weeks later, Hou repeated the same assurances to Piper Sandler. ¶124.

The Q3 Earnings Call confirms statements in the analyst reports "clearly originated from [Semtech]." *Oracle*, 380 F.3d at 1235. In *Oracle*, analysts' summaries were substantively the same as other alleged misstatements that had been quoted directly from defendants. 380 F.3d at 1234. Here too, Hou repeated the substance of Statements 1 and 2 in the Q3 Earnings Call. *See* ¶126. Up until their February announcement, Semtech continued to use analysts to communicate the existence of the so-called "support[]" for their ACC floor case. ¶¶132-34.

Defendants concede that Statement 1 came from either Hou or Lin.[8] MTD at 6. Semtech is liable for the statement in either case. *See In re TUT Sys., Inc. Sec. Litig.*, 2002 WL 35462358, at *5 (N.D. Cal. Aug. 15, 2002) (statement in analyst report attributed to "company's management" actionable); *see also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (imputing statements made by agent to corporation).

Statements 7 and 8 are summaries of Semtech's statements to analysts at major industry gatherings. ¶¶132, 134. Defendants take issue that the comments were

---

[8] Defendants do not dispute Statement 2 is attributable to Hou. *See* MTD 6, ¶124 ("**CEO Hou reiterated** SMTC's ACC expectations.")

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

attributed only to "management," but basic agency principles dictate the "management" attending these events and making "statements to analysts with the intent…that analysts communicate them to the market" had the authority to do so. *In re Peoplesoft, Inc.*, 2000 WL 1737936, at *4 (N.D. Cal. May 25, 2000); *see In re Nelson*, 761 F.2d 1320, 1322 (9th Cir. 1985). Semtech is liable for misleading statements attributed to "management" or "the company." *See In re Nimble Storage Sec. Litig.*, 2017 WL 4355570, at *3 (N.D. Cal. Oct. 2, 2017); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020).

### 3.  Defendants' Statements Are Not Protected by the Safe Harbor

The PSLRA's safe harbor only shields forward-looking statements that are either "accompanied by meaningful cautionary statements" or made without "actual knowledge" that they were misleading. 15 U.S.C. § 78u-5(c)(1).

Defendants stretch the safe harbor too far. First, they cannot "convert into a forward-looking statement" a misrepresentation about the present status of the 36x2 racks "simply by following it with a quintessential forward-looking statement: one forecasting future growth." *In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *1 (N.D. Cal. Sept. 14, 2021); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) (safe harbor does not shield "statement about current or past facts … combine[d] … with a forward-looking statement"). Here, Defendants misled investors by assuring them there was still a broad market for its CopperEdge chips when the objective facts were to the contrary. Without a viable market for CopperEdge—a then present fact—there would be no support for any sales guidance. *E.g.*, ¶ 134 (management "comfortable" with $100 million market because architecture "continues to be supported"); *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050 (N.D. Cal. 2018) (representations of historical fact "which provided the factual predicate for [a] revenue prediction" not forward-looking).

Second, even if Defendants' statements are forward-looking, they "carry the burden of demonstrating that they are protected by the meaningful cautionary language" which requires them to show "their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772-73 (2d Cir. 2010). Defendants make no attempt to do so. They concede their statements to analysts lacked any cautionary language, and for the Q3 Earnings Call, they point to extraneous documents which simply acknowledge that "competitive changes in the marketplace," slow "adoption rates of applicable products," and customers no longer "incorporating our products" could occur. MTD 15. These cautions "simply rehashed a constant reality of most product driven businesses: demand can change in the context of evolving product lines," rendering them "uninformative boilerplate" that lacked any mention of the specific market opportunity at issue. *In re Illumina, Inc. Sec. Litig.*, 2018 WL 500990, at *4 (S.D. Cal. Jan. 22, 2018); *Rodriguez*, 325 F. Supp. 3d at 1052 (explaining "[c]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions" and finding warnings that results could vary because of "customer acceptance and purchase of our existing products" too general) (internal quotation marks omitted). Moreover, as in *Glazer*, 63 F.4th at 780, any disclaimed risk had already materialized—the use case supporting the floor case for CopperEdge revenue no longer existed. *Id.* None of Defendants' cautionary statements said anything about CopperEdge or Nvidia's support for the NVL36x2 rack system.

### 4. Defendants' Statements Are Neither Inactionable Opinions Nor Puffery

Defendants' insistence that their misrepresentations were "all framed as opinions" misstates both the law and facts. MTD 16. Defendants contend that the representation that Semtech had "been **unable to find any evidence of** any changes to Nvidia" deployment plans and that "ACC remains **on track**," were statements of "opinion." *Id.* (emphasis in original). Affirmatively representing that Semtech had looked for, and not found **any** evidence is a representation of then present fact, not an

opinion. So too with representing the continued existence of a specific business opportunity.

Defendants are also incorrect that statements "framed as opinions" are inactionable. The Supreme Court teaches that phrases such as "'we believe' or 'we think' ... can preface nearly any" statements which "remain perfectly capable of misleading investors." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 193 (2015). Opinion statements can mislead where they "imply facts about the inquiry the issuer conducted or the knowledge it had" and "the real facts are otherwise, but not provided." *Id.* at 176. Here, Defendants created a false impression by reaffirming that their CopperEdge expectations were unchanged despite discontinuation of support for the NVL36x2 architecture. *See Glazer*, 63 F.4th at 771 (by "repeatedly reassur[ing] investors" that the "prospective sales in the pipeline was unchanged" defendants "affirmatively create[d] an impression of a state of affairs" that did not "fairly align[ ] with the information in [defendant's] possession…") (internal quotation marks omitted).

Nor is Statement 7 immaterial puffery. Defendants' representation that "the ACC remains on track with NVDA's Blackwell," ¶132, is a verifiable representation central to Semtech's business, not unimportant optimism.

Actionable statements are objectively verifiable; puffery is not. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). A court may dismiss as puffery only statements which are "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1154 (C.D. Cal. 2022). Semtech's CopperEdge opportunity was unquestionably important to investors and depended on Nvidia's continued support and hyperscalers desire to use the NVL36x2. Semtech represented that the CopperEdge opportunity remained "on track" despite the objective facts to the contrary. This addressed a specific, material aspect of

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

Semtech's operations and was objectively verifiable. Semtech's admission on February 7, 2025 confirmed the market opportunity for the NVL36x2 did not exist. Accordingly, Statement 7 is not puffery, but a material, factual representation. *See Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1054–55 (N.D. Cal. 2018) (statement about being on track to deliver revenue growth not puffery because it "went beyond just providing subjective or emotive descriptions").

**B. The CC Pleads Facts Supporting a Strong Inference of Scienter**

A plaintiff can establish scienter "by showing deliberate recklessness or 'some degree of intentional or conscious misconduct.'" *Sona*, 2022 WL 22879627, at *4 (citing *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016)). Deliberate recklessness is "an extreme departure from the standards of ordinary care which presents a danger of misleading … that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* "[T]he inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23, 326 (2007)) ("The court's job is not to scrutinize each allegation in isolation but to assess the allegations holistically.").

**1. Semtech's Debt Was a Serious Threat and It Needed the December 2024 Stock Offering to Reduce the Debt**

By Spring 2024, Semtech's massive debt became an "existential threat" that forced it to repeatedly renegotiate its credit agreements and issue $250 million in convertible notes. ¶¶68, 71, 73, 76, 146. The billions in debt left Semtech "teetering on the edge of insolvency" by the close of FY2024 (in January 2024) and the problem worsened throughout the calendar year. ¶¶76-77. Lin and Hou repeatedly declared that Semtech was focused on reducing debt through asset sales. ¶¶78-81. Leading up to Semtech's December 2024 stock offering, Hou and Lin repeatedly emphasized the scale of the ACC opportunity and denied that the headwinds identified by public facts

were a threat to the Company's prospects. ¶¶122-135. Defendants were motivated to mislead investors about the scope of the ACC opportunity to ensure that the December 2024 stock offering was a success so Semtech could reduce its debt obligations, which had ballooned to a net leverage ratio of 11.2x just before the offering. ¶83.

In *Sona* this Court found that "a plausible financial motive for defendants to lie" could support a strong inference of scienter. 2022 WL 22879627, at *4. There, Sona had incurred significant operating losses and management acknowledged "the necessity of securing additional funds." *Id* at *2. Defendants' positive statements about the company's product drove its share price higher. *Id.* Sona paid off notes by issuing shares of stock and raised funds through a private placement and a shelf-registration. *Id.* However, in weighing the competing inference of scienter, the Court found it cut against scienter as "the more plausible inference is that the company made optimistic statements about its prospects for FDA approval because its U.S. testing looked promising, not because the company was quixotically seeking FDA approval for [Emergency Use Authorization] it knew was destined for defeat." *Id.* at *4. Plus, the Court found the fact that none of the "Defendants sold their stock at inflated prices points against a finding of scienter." *Id.*

By contrast, here, Defendants were financially motivated to lie about the market for its CopperEdge product and to refute reports that Nvidia was not promoting the NVL36x2 rack system. Lion Point gained its board seats promising to reduce Semtech's debt; Hou, a Lion Point-picked director, replaced Pickle, noting his top priority was asset sales to reduce debt. ¶¶7-8. When reports began to surface that Nvidia was discontinuing support for the NVL36x2 configuration, and public facts (such as the OCP Conference and Microsoft and Oracle announcing their use of the NVL72) surfaced, Defendants claimed to the contrary that the market for their CopperEdge cables existed sufficient to support their revenue projections. Semtech increased the size of its secondary offering by 60%—from $400 to $661 million—and met Lion

- 17 -

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

Point's and Hou's goals of dramatically reducing Semtech's debt. ¶82. And Lin—who had never previously sold any of his stock holdings—earned $650,000 through stock sales, which was more than his annual salary. ¶153. Shortly after the $661 million stock offering and stock sales, Defendants admitted the truth: the market opportunity for its CopperEdge cables was less than previously claimed. ¶167.

Unlike in *Sona*, Defendants' aims were not quixotic—all they had to do was repeat earlier claims of a robust market for CopperEdge until after the offering was successful. Only then would they need to admit the truth.

Defendants competing explanation is that "Semtech's desire to raise capital" is simply "a generic financial motivation" and the more plausible inference is that "Defendants accurately updated the market as they learned new information." MTD 19, 22.

Plaintiff submits that his inference of scienter is "at least as compelling as any opposing inference of nonfraudulent intent." *Sona*, 2022 WL 22879627, at *5. It is just as (if not more) likely that Defendants misled investors about the continued market opportunity for CopperEdge long enough for Semtech to raise desperately needed funds to reduce it crippling debt, than to accept the alternative explanation that things "suddenly changed." *See In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (defendants motivation to artificially inflate stock price to conduct a successful secondary public offering and obtain much-needed operating capital supported a palpable motive for fraud stronger than generic desire to raise capital); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *6 (D.N.J. Jan. 12, 2018) (motive to inflate stock price to allow profitable secondary offering supported strong inference of scienter).

### 2. Lin's Stock Sales Support Scienter

Lin's stock sales created a financial incentive for him to maintain the artificially inflated stock price during the class period. *See Indiana Pub. Ret. Sys. v. Pluralsight,*

*Inc.*, 45 F.4th 1236, 1266 (10th Cir. 2022) ("previously scheduled trade" provided motive to misrepresent information and supported an inference of scienter). Lin entered a 10b5-1 trading plan on September 17, 2024, setting sales in motion starting just days after the secondary offering. ¶148. Lin sold shares on various dates between December 17, 2024, and January 29, 2025, netting over $650,000 in profit. ¶¶152-53. Lin's stock sales were unusual in both timing and volume—he had never sold *any* shares of Semtech common stock since becoming CFO in September 2023, but his sales during the Class Period generated a windfall that exceeded his annual salary. ¶¶152-54.

Defendants argue that "stock sales pursuant to a Rule 10b5-1 plan do not establish scienter" regardless of the timing, circumstances, or content of the plan. MTD at 20. Not so. Standing alone, the mere fact that stock trades were made pursuant to a 10b5-1 plan does nothing to negate an inference of scienter. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 n.3 (N.D. Cal. 2019) ("[N]ot every 10b5-1 plan is sufficient to negate the inference"); *Apple*, 2020 WL 2857397, at *22 n.13 ("[U]se of the 10b5-1 plan … does not rebut well-pled allegations of scienter at the pleading stage.")

In *Pluralsight*, the Tenth Circuit found "the existence of a Rule 10b5-1 plan, without more, does **not** automatically rebut an inference of scienter" because "such plans can be manipulated easily for personal financial gain and thus cannot rebut the inference that personal financial gain was a motive…" *Compare* 45 F.4th at 1265-66 (emphasis original) *with* ¶¶156-63 (summarizing academics' and regulators' concerns about 10b5-1 plans). The "mere fact that a trade was made under a 10b5-1 plan" therefore does "not per se rebut the inference of scienter where, as here, a defendant was allegedly motivated to misrepresent or withhold material information to affect a stock price in anticipation of a previously scheduled trade." *Pluralsight*, 45 F.4th at 1266.

The CC alleges that after "setting up automatic trades," *id.* at 1266; ¶148, Lin made misleading statements that artificially inflated Semtech's share price, ¶¶122-35. Defendants offer no persuasive response. While 10b5-1 plans can serve as the basis for an affirmative defense to claims of insider trading, Lin has not provided enough information about the content of his 10b5-1 plan to raise such a defense, ¶163, much less rebut an inference of scienter. *See Azar v. Yelp, Inc.*, 2018 WL 6182756, a \*19 (N.D. Cal. Nov. 27, 2018) ("Without reviewing [defendant's] actual trading plan, the Court cannot determine whether these requirements [of Rule 10b5-1] were met, and cannot conclude that the plan negates any inference of scienter.").

### 3. The Temporal Proximity Between the False Statements and Disclosure of the Truth Supports Scienter

The close temporal proximity between Defendants' false statements and the subsequent disclosure of the truth supports scienter. *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 667 (E.D. Pa. 2021) (announcing large charge eight weeks after statement that reserve levels were fine supported falsity); *see also In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at \*10–11 (N.D. Cal. Nov. 4, 2020) ("[T]he law is clear that close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure may bolster an inference of scienter … [t]hat is because temporal proximity makes more plausible that intervening events did not cause the inconsistent statements.") Here, less than three weeks passed between Semtech's last round of reassurances regarding the floor case for ACC products on January 21, 2025, ¶134, and the Company's acknowledgment that the floor case was unachievable "due to rack architecture changes" on February 7, 2025. ¶139. As in *Berson v. Applied Signal Tech., Inc.*, Semtech's abrupt reversal supports an inference of scienter. 527 F.3d 982, 988 n.5 (9th Cir. 2008) (corrective disclosure just weeks after misleading statement supported inference of scienter).

Additionally, many of the misstatements themselves include claims by the Individual Defendants that they had in-depth knowledge of the ecosystem for

Semtech's products and that those insights supported the market opportunity for CopperEdge. *See Quality Sys.*, 865 F.3d at 1145-46 (finding scienter where "executives themselves told investors they had real-time access to, and knowledge of, sales information"); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1187 (N.D. Cal. March 22, 2021) (strong inference of deliberate recklessness where defendant acknowledged understanding of sales practices); *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *19 (W.D. Wash. Apr. 19, 2019) ("[S]cienter can be inferred where a corporate officer states that he or she knew about or was monitoring the subject of the misleading statements.")

Hankin's abrupt resignation on November 26, 2025—the day after the Q3 Earnings Call and two weeks before the $661 million offering—supports an inference of scienter. ¶105. Resignations that are "uncharacteristic when compared to the defendant's typical hiring and termination patterns" or otherwise "accompanied by suspicious circumstances" support an inference of scienter. *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605, 622 (9th Cir. 2017). Defendants' only response, is to suggest that if Hankin resigned for the reasons inferred, Semtech would have filed a Form 8-K stating as much. MTD 13. Defendants are simply disputing the facts and point to no authority in support of their claim that they may rely on an SEC filing that was never made to rebut an inference of scienter.

Finally, the magnitude and timing of Semtech's reversal lends support to the inference that Defendants acted with scienter. Semtech's mid-quarter Form 8-K acknowledging that the market for CopperEdge did not support that it would meet its floor case on February 7, 2025, was filed in rapid response to Baird's report trimming Semtech's price target the day before. ¶¶136-39. This admission came "just twelve days after the close of FY2025 … before Semtech filed its 10-K for 2025" and

- 21 -

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

approximately eight weeks after the close of the December 2024 stock offering. ¶139. The magnitude of the reversal and its unusual timing support an inference of scienter.

### C. Plaintiff Adequately Alleges Control Person Liability

Because a predicate § 10(b) violation is adequately pled, the Court should sustain Plaintiff's §20(a) claims against Hou and Lin. *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *24 (C.D. Cal. Oct. 1, 2013).

### CONCLUSION

Plaintiff respectfully requests the Motion to Dismiss be denied.

August 25, 2025                                     Respectfully submitted,

*/s/ Jacob A. Walker*

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025
jake@blockleviton.com

Jeffrey C. Block (*pro hac vice forthcoming*)
Michael D. Gaines (*pro hac vice forthcoming*)
Zoe van Vlaanderen (*pro hac vice forthcoming*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
michael@blockleviton.com
zoe@blockleviton.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

LEAD PL.'S OPP. TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPL.

# CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2

The undersigned, counsel of record for Lead Plaintiff, certifies that this brief contains 6,995 words, which complies with the word limit of L.R. 11-6.1.

August 25, 2025                                         */s/ Jacob A. Walker*
                                                         Jacob A. Walker (SBN 271217)