UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| COLLEEN KLEOVOULOS, | ) | CASE NO: 2:25-cv-01474-MCS-JC |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| SEMTECH CORPORATION, ET AL, | ) | Monday, September 22, 2025 |
| | ) | |
| Defendants. | ) | (9:52 a.m. to 10:24 a.m.) |

CONSOLIDATED WITH:
2:25-cv-01612-MCS-JC
2:25-cv-02058-MCS-JC
2:25-cv-07487-MCS-JC

MOTION HEARING

MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT
[ECF.NO.54]

BEFORE THE HONORABLE MARK C. SCARSI,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                SEE PAGE 2

Court Reporter:             Recorded; CourtSmart

Courtroom Deputy:           Stephen Montes Kerr

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:


For Plaintiff:            JACOB A. WALKER, ESQ.
                          Block & Leviton
                          400 Concar Drive
                          San Mateo, MA 94402
                          650-781-0025


For Defendants:           SARA B. BRODY, ESQ.
                          SARAH HEMMENDINGER, ESQ.
                          JAIME A. BARTLETT, ESQ.
                          Sidley Austin
                          555 California Street
                          Suite 2000
                          San Francisco, CA 94104

**Los Angeles, California; Monday, September 22, 2025; 9:52 a.m.**

--oOo--

THE COURT: Calling item No. 4, cv-25-1474, consolidated with cv-25-1612 and cv-25-2058:

Colleen Kleovoulos versus Semtech Corporation, et al;

Liran Tobi, et al. versus Semtech Corporation, et al;

and Oliver Wronski versus Semtech Corporation, et al.

Counsel, state your appearances please.

MS. BRODY: Good morning, Your Honor, Sara Brody of Sidley Austin on behalf of the defendants and with me are my colleagues Sarah Hemmendinger and Jamie Bartlett.

THE COURT: Good morning.

MS. BARTLETT: Good morning, Your Honor.

MR. WALKER: Good morning, Your Honor, Jacob Walker from Block and Leviton on behalf of lead plaintiff.

THE COURT: Good morning. Okay. So we are here on a motion to dismiss. I'm trying -- you know, the best way to sort of chew through some of these issues, I wanted to kind of separate the statements into two buckets. The first bucket I guess would be statements that were made or that come out of analysts' reports, as opposed as to statements that are alleged to be made by the defendants.

With respect to the analysts' report statements and I think we're looking at statements 1, 2, 7 and 8, let me ask the plaintiff, is there any -- if the Court were to grant the

4

motion with respect to those statements based on the case law, is there anything -- do you think you could allege that could drill down on those statements a bit?  So for example, statement 1 is a conversation with Hou and Lin, but the statement's not alleged to be necessarily made by either of them specifically.

You know, statement 7, management continues to underscore; statement 8, management remains comfortable.  I'm just wondering is there anything you could allege further in the complaint, in an amended complaint, that could add more detail in to who made -- who allegedly made those specific statements.

MR. WALKER:  Thank you, Your Honor.  And I think statement 1 is probably the strongest of those.  To focus on, the only thing I can think of -- well, there's two things I guess, one is to date, we have not been able to obtain a transcript of the fireside chat itself, so we would continue to search for it, but we just haven't been able to do that yet. So if you ask me to do it today I couldn't.

Separately, I guess we could plead a little clearer that the company would be responsible for the statement of either one, even if you can't attribute to a specific individual, whether it was the CEO or the CFO is at least the company that would be responsible, and then of course, if we got to discovery you could then go back and replead which of

5

the two it was.

THE COURT:  Okay.  Let me hear from the defendants, just on this issue.  If the Court were to agree with you and grant the motion with respect to those four statements because they're made by analysts and not by the defendants, any reason why the Court shouldn't give the plaintiffs leave to amend to add some further flesh on those bones?

MS. BRODY:  Yes, thank you, Your Honor.  So I recognize that as a general rule, plaintiffs get an opportunity to amend.  I actually think as to those four statements this is potentially a different situation, because it's really a legal matter.  And so I don't think that amendment improves the situation.

Here, the statements that are being alleged are statements made by analysts.  There are paraphrases or the analysts' interpretation of what the individuals may or may not have said.  And if you look at the -- at Janus from the U.S. Supreme Court, it's very clear, it's only the maker of the statements that can be liable for those statements.

On those statements, it would only be the analysts. Those are the makers of the statements, not the individuals. So I don't think there's any way to fix that problem with, you know, more allegations.  It's just -- it's a problem as to where the statements are.

THE COURT:  Okay.  Let me turn back to the plaintiff.

6

So again, you know, the Janus case from the Supreme Court kind of is the bar that you're trying to get over.  A lot of the case law you cited in your brief was pre-Janus.  What's the best authority you have post Janus that a statement that is reiterated by an analyst but attributed to one of the defendants is fair game here.  And one of the statements, for example, statement 2 the Piper Sandler included the language CEO Hou reiterated SMTC's ACC expectation, so it seems like it's attributing a statement directly to him that he made, you know, quoting it.  What's the best authority that that's actionable?

**MR. WALKER:**  So I don't think either side was able to cite a post Janus case on this precise point.

**THE COURT:**  Uh-huh.

**MR. WALKER:**  I do -- so -- and I don't think that Janus changed the general idea that we're not looking to hold defendants responsible for an analyst gloss.  What we're looking to do is hold them responsible for analyst reporting, re-reporting what was being said at, for example, the fireside chat.

The strongest evidence we have there, again back to statement 1 this is very similar in kind to what defendants then say in the November earnings call.  So I don't think either side was able to cite to a specific post Janus case on this point.  But I don't think there's anything in Janus that

**EXCEPTIONAL REPORTING SERVICES, INC**

7

would suggest that idea that there's a difference between trying to hold the company liable for an analyst's expectations that come from statements made, right, an analyst hears something from the company and then makes its own projections about what's going to happen.  We don't think that's actionable.  But an analyst repeating what the company told them is a different story.

THE COURT:  And so the -- you would argue if the analyst is essentially quoting the director or the CEO then that's fair game.

MR. WALKER:  Right.  And so --

THE COURT:  And there's no case law at least the Court can use to --

MR. WALKER:  I don't think either side has post Janus case law on that point specifically.

THE COURT:  Okay.  So let me turn back to the defendants.  On that point, you know, we have an analyst.  Let's say a situation where we have an analyst that's sort of quoting a -- the CEO.  The CEO said X, is there -- is that still inactionable under Janus?

MS. BRODY:  So that might be a statement that could survive or, you know, be considered by the Court if there was an actual quote and actually that is the Apple case.

So there are two post Janus cases that are cited in the papers.  They're both cited initially by the plaintiffs in

8

their opposition.  One is Apple.  And in Apple there is a quote from one of the defendants.  And in addition, in Apple I -- no, I'm sorry, that was a different case.  I was thinking about the Oroco (phonetic) case.  But it is an actual quote from an individual, as opposed to what we have here which are analyst reports where the analyst has packaged up what they've heard, what their views are and put it all together.

The other post Janus case we have is Nimble Storage and in Nimble Storage the Court granted the motion to dismiss and dismissed with prejudice.  So plaintiffs cited this in their opposition, I don't know why, and it only discusses analyst reports in a footnote, it doesn't mention Janus, even though it's post Janus.  So, in some ways, you know, not the best case for anybody because there are limitations on it.  But the outcome in that case is to grant the motion to dismiss and dismiss with prejudice.

So, you know, this is unusual.  It's actually pretty unusual post Janus to have analyst reports used in this way. And so it -- in some ways, we looked really hard, but it actually doesn't -- didn't really surprise us in the end that we didn't find much because for exactly this problem, it isn't really be done.

THE COURT:  Okay.  And the second case you cited is from the Northern District of California, correct?

MS. BRODY:  Correct, yeah.

THE COURT: And the Apple case that you're referring to is from?

MS. BRODY: The Northern District of California.

THE COURT: Northern District as well.

MS. BRODY: Yeah.

THE COURT: Okay. Thank you. Let me turn back to the plaintiff. In looking at -- so again, I'm looking at the other bucket of statements, the bucket of statements not in the analyst report.

Let's look at statement 4. That said, allow me to provide some assurance based on our ecosystem engagement. We have invested time with our customer and end users of the racks over the past few months. We reaffirmed our expectations of exceeding the floor case, provided a couple of quarters ago, based on first-hand information from the ecosystem.

So essentially this statement is saying, we've done some investigation, we've talked to people in the ecosystem, we believe our estimates are sound. Your allegations of false -- that that statement's false, are they purely based on the Quo report (phonetic) and sort of the -- I guess what I'm trying to say is it seems like the allegations are that these statements are implausible, as opposed to any direct allegations that they're false.

So, for example, you have nothing in your complaint that says that they -- that Hou didn't talk to customers and

end users and, you know, didn't perform this ecosystem engagement, correct?

MR. WALKER: Right. I think what we've got is not just a Quo report but the market reaction overall, so I think we also cite to -- and in the complaint in paragraph 94 and 95 deal with the OCP conference, the other hyperscalers who were announcing that they were moving to the 72 and not the 36 by 2. And it's the combination of all that along with the co-report. And then the quick reversal the day after the underwriter for the secondary offering comes out and puts out a report saying they're not seeing the pickup.

But I agree, you know, we don't have the direct sort of smoking gun evidence of, you know, they didn't talk to people. What we have is all of the circumstances, which suggest at least severe recklessness because had you been talking to people you would have seen -- they were essentially denying what the market was saying, right. All of these analysts, all of the commentators were saying 36 times 2, x 2 is not taking off and they came out and said, that's not what we're seeing.

And the allegation I guess is, when you combine it altogether, what happened in the public during that time period and then at the end is that it's not plausible, that's right, that they could have had those conversations and communications and come out and said not just that things are okay, but you

know, that the statement one unable to find any evidence.  It's a pretty strong statement.

Assurances based on ecosystem engagement allowing them to reaffirm that you couldn't make that strong of a statement.  Once you've spoken about that engagement, you've got to tell the whole story and not just the good bits, to the extent that there were any at all.

THE COURT:  And just from making sure I understand all the facts, was it the case that Meta was using a 36 by 2?

MR. WALKER:  So it's not entirely clear.  Certainly it's clear that they had at least a 36 times 2 as part of what they called Catalina, but there's also evidence in the complaint that we cite to that they hadn't coalesced on a specific solution, some of the issues they talk about in their press releases as part of that OCP conference, make reference to power requirements that would have implied that they were using a 72.

And so they certainly had some version of Catalina that used a 36 x 2 at some point, but the base case that Semtech offered early on, even before the class period, was based not just on Meta, but on hyperscalers overall and the larger opportunity.

THE COURT:  Okay.  Let me turn back to the defendants.  So the argument seems to be from the plaintiffs, that although there's no direct evidence that these statements

12

that were made on the -- I guess these are in one of the earnings calls, that there's no direct evidence that these are calls meaning that they didn't talk to their engagement ecosystem folks or that they, you know, they didn't believe in their expectations.

When you put it altogether with the clear direction of the market, with the Quo report and the moving away from the 36 by 2 in favor of the 72 architecture, why isn't that enough to allege that these statements are either false or, you know, in reckless disregard of facts that they should have known?

**MS. BRODY:** Yeah.  So there's -- I'd like to break the statement into two pieces.  One is that the executives at Semtech were out talking to the customers and others and there's no -- nothing at all in the complaint that says, no, they weren't doing that.

**THE COURT:** Uh-huh.

**MS. BRODY:** And you would think that if they weren't doing that, plaintiffs, who are very diligent, would have found a former employee or somebody at one of these other companies or something to say, oh, they didn't talk to me.  I mean that may or may not actually show they weren't doing that, because it would show that they didn't talk to one person, but they show nothing.  And so -- and that's a big part of what they're arguing.

The other piece is really the opinion statement of

13

management.  So, you know, we have to think about these statements that are being made at the November 25th earnings call for the variety of problems that were in them.

The first which is what Your Honor is focusing on, I think is the most central and that is, is it a false statement at all.  And when you look at the timeline you have a blog by this gentlemen, Mr. Quo (phonetic) that comes out at the beginning of October.

It's a blog.  It's his opinion.  He doesn't cite any sources in it.  He's just -- these are his speculations about what is happening at that moment.  And he says in that blog, and everybody else says everywhere else, this is a fast moving and changing market.  That's his opinion on October 2nd, may or may not be true, but that's what he says.

And then you have the middle of October and the open compute conference and Meta shows up and shows, among the various things, that they're putting out the 36 by 2.  So on October 15, Meta may be using other architecture, other people may be using other architecture, but Meta is clearly saying, we're showing the 36 by 2.

And then you have the analysts' reports that the plaintiffs cite following that, which if you look at them in totality, which is why we put them in to our request for judicial notice for completeness, you'll see that the analysts who were clearly out talking to a lot of people are saying

14

things like, if you look at Exhibit 7 you have on the second page of it, the -- what the plaintiffs say is their challenged statement, where management didn't back away from their prior statements.  That's the challenged statements.

And the paragraph directly above that, from the analyst at Piper Sandler is that NVL 36 by 2 is alive and well.  That's the opinion of that analyst at that time.

So there were no facts here that show that the whole market has backed away from 36 by 22.  What the plaintiffs allege the Quo report says and what the plaintiffs allege in their complaint, when you look at the repeated paragraphs that are the same as to each challenged statement, is that the 36 by 2 had been halted.  Wasn't anymore.  Clearly that's not the case.

And most importantly, there are no facts that show that that was the belief of the individual.  So the statements that are made on October 25th are not only without any facts to show that they're false, they're opinion statements of individuals and there are no facts to show that those individuals didn't honestly hold those opinions or anything objective to show that they couldn't have, that would be what -- on the care it says we have to have and mostly they're forward looking, for what they think is going to happen in the future and there's sufficient cautionary language around it.

So, you know, all total the November 25th statements

we think should be dismissed.

THE COURT:  Now, once the Quo report comes out, right, the -- your arguments are the Quo report wasn't very definitive, there were statements saying the market's moving rapidly, but wasn't there a significant stock price drop after that report?

MS. BRODY:  I don't have the chart in front of me, I'm sorry.  There were stock price declines at a variety of times during the class period.

THE COURT:  And if there was a stock price decline after the Quo report, that was significant, it's fair to assume that the executives at -- from your client knew about that report then?

MS. BRODY:  I expect that they did know about the report.  We don't have facts one way or the other in the complaint, but I mean, you know, it'd be hard to imagine given the later statements that they don't know about the report, but we don't have any facts on that in the complaint.

THE COURT:  Okay.  Now, one of the things that I wanted to get to was scienter, but maybe I'll start with the plaintiff first, thank you.

MS. BRODY:  Okay.  Thank you.

MR. WALKER:  Could I just make one quick point on the falsity?

THE COURT:  Sure.

**MR. WALKER:** I just wanted -- we have this in footnote 3 as well of the opposition, but I do think it's important to point out that we don't need the strong inference on the falsity. The falsity is judged as a plausibility standard.

**THE COURT:** Right, right. Yeah, so your briefing made the point that the high standard for scienter doesn't apply to plausibility.

**MR. WALKER:** Right.

**THE COURT:** So let's talk about the high standard --

**MR. WALKER:** Yes.

**THE COURT:** -- for scienter.

**MR. WALKER:** I walked into that one, didn't I?

**THE COURT:** Yeah, good segway there. So the gist of the scienter argument is that they needed to get rid of the debt and so that need to get rid of the debt is what drove them to, you would allege, make these false statements.

**MR. WALKER:** Yeah, I think it is -- that is certainly the biggest piece of the puzzle. As you know, you review scienter holistically, but you know, you've got a situation, it's not ordinary or routine, they're debt ratio after the secondary offering that they conducted went from 11 to 2, it was a dramatic change.

It was described as priority number 1 by the new CEO. We lay out the background on the wireless acquisition. So you

17

take that, you combine that with the director resignation, which again on its own doesn't get us very far, but you start piecing all this puzzle together, you put the stock sales in -- and I know that they make a sort of 10(b)(5)(I) plan defense, I don't think it helps them, because we just don't have the whole 10(b)(5)(I) plan.

Our allegation is not that the CFO knew at the time that he entered into the 10(b)(5)(I) plan that he was going to commit securities fraud, it's that he knew the terms of the plan.  And we don't know what those terms were or what the triggers were, we just know when they were triggered, which is just shortly after the secondary he sold his stock as well.

So you combine all that together and that's where you'd get the strong inference from again it's a holistic review and not just taken in isolation.

**THE COURT:**  Right.  But there's no direct evidence, this is all conjecture.

**MR. WALKER:**  No.  And Telapse (phonetic) tells us that we don't need the smoking gun, we don't need direct evidence.  It's -- it's not -- it doesn't even need to be the most plausible, right, just has to be as plausible as any innocent inference.

And so under the circumstances and particularly, you know, the other piece I get on the scienter point that I didn't make of those other three is the short time too, the -- just

18

the eight weeks between the secondary and then the about face.

THE COURT:  Okay.  And let me hear from the defendants.  You'll agree that under the law we don't need a smoking gun, we don't need a, you know, document that -- to support a finding of scienter.  But you're arguing that based on the high bar this conjecture isn't enough and that these are mere -- the elimination of datas is something that everybody's doing, it's a, you know, sort of a corporate function.  But what about the timing?  Doesn't the timing help to make a finding of scienter here?

MS. BRODY:  Your Honor, are you referring to the timing between the short time between the end, the last (indisc.) statement and then the disclosure, the 8-K disclosure in February?

THE COURT:  Exactly.

MS. BRODY:  Yeah.  No, I don't think that that's it, I don't think that that's good enough.  And actually if you look at the one case that the plaintiffs have cited, the MCCOM case.  In that case, it doesn't say that short timing is enough.  That case had a bunch of confidential witnesses.  Those witnesses had a lot of information about what people knew and thought.  And even in that case, the Court dismissed the complaint and granted the motion to dismiss.

So I don't think the short timing is sufficient, particularly when you look at this kind of industry, when there

EXCEPTIONAL REPORTING SERVICES, INC

19

is so much that's happening and it's happening so fast and everything that is being challenged is not what is going on specifically internally within Semtech.  It's what the other players in the industry are doing.

So the fact that you have changes in the industry happening quickly and the short time frame, because they're learning about what somebody else may or may not be doing, I don't think is surprising and doesn't suggest anything they said prior to that was false.

The Quo report itself, if we're going to credit that at all does refer to this fast changing industry.  You get that throughout the different various analysts' reports.  And so I don't think the quick time is terribly indicative of anything at all.

THE COURT:  Okay.  One thing and kind of reading through this and trying to get my arms around it, one of the things that struck me is the Quo report certainly wasn't hidden.  In other words, everybody knew about the Quo report, correct?

MS. BRODY:  Correct.

THE COURT:  And so is there an argument to be made that the fact that the statements don't necessarily cite the Quo report, but the statements are made with sort of the understanding the Quo report is out there, in order to show the statements were false, you'd have to do more than just say they

20

were conflicting with the Quo report.

MS. BRODY:  Well, correct.  I mean, the fact that different people have different views doesn't make the speaker's views false.  You have to actually show that they're false, or that the speaker didn't have a reason for saying what they're saying.

I think the other thing that's important with respect to the Quo report and then the 8-K disclosure at the end, although we're not arguing loss causation here, because we thought that was, given everything else, that's a harder argument to make so we were selective.

But -- and so I'm not arguing loss causation, when I say this, what I would suggest is that you see that there is a -- there's not a direct match up.  So it isn't as if when you get to February the defendants say, oh, my gosh, yes, the Quo report was right.

Quo says that Nvidia has halted the 36 by 2.  Well, we see after that, that that is not correct.  Nvidia does not halt the 36 by 2.  In fact, you see that Meta is using it in Catalina, the Nvidia product.

And then there's the January statement that we put in in our IJN as well by Jensen Huang who's the CEO and founder of Nvidia, where among the various architectures he talks about is the 36 by 2.  So Nvidia is still talking about it when you get to January.

21

And then what Semtech actually says in the 8-K in February is not, this has been halted, there is no more, they talk forward looking primarily.  They talk about what's happening at that moment in terms of what the results are going to be right then and then forward looking, there's going to be sort of a push out and delay.

And so it's a not one-for-one where they finally admit that Quo was right, nobody ever admits that Quo is right.  And, in fact, all of the information that comes in following Quo suggests that he's not exactly right.  That there isn't a halt.

Do you want me to address the other issues on scienter about debt, et cetera?

THE COURT:  I think I'm good on that.  But let me ask you, I want to -- before we kind of wrap up, I want to talk about the safe harbor issue with respect to the earnings calls statements.  And as I understand plaintiff's arguments, it is that, you know, you can't just get an earnings call and say, you know, these are -- everything I'm going to say is forward looking and then get into some significant detail further on without sort of kind of reiterating those points.

But what's the best case you would direct me to to figure out the metes and bounds of what's safe harbor and not?

MS. BRODY:  Do we not have -- asks for the best case to use.  I think for the best case to use, you'd probably want

22

to look at page 15 of our motion where we talk about both the Police Retirement System of St. Louis and also In Re Queterra (phonetic).

But I also would say that plaintiff's argument that you have to be repeating cautionary language --

THE COURT:  Uh-huh.

MS. BRODY:  -- throughout is not what the law says. And also frankly completely sort of impractical and implausible.  So, you know, if you listen to any company's earnings call there's the cautionary language that is said at the very beginning and then prepared statements by the executives and then Q and A.  And a lot of these statements really come up in the Q and A.  And so they sort to get a little imprecise.

It's not realistic and no one has -- I've never seen a situation where the executives say, referring back to our cautionary language now let me tell you what's going to be happening next.  I mean that's -- nobody expects that.

So we have the cautionary language.  It's very complete here, quite specific, really you know, on point, which isn't always the case.  And then what they're talking about on that earnings call is looking forward to the future.

THE COURT:  Thank you very much.  Let me have -- let the plaintiff wrap up and kind of deal with this safe harbor issue.  And what are you alleging that they needed to do that

they didn't do to take advantage of the safe harbor protections?

MR. WALKER:  I will say I think we do agree, there wouldn't be a need to continue to reiterate over the course of the earnings call repeating back to the risk factors and the warnings.  But the risk factors do have to be meaningful.  The argument here is twofold.  One is that at least some of the statements, and I'm going back particularly to the statement I think we called it number -- I apologize.  Number 4, the statements about their engagement with vendors and ecosystem engagement, that's not forward looking at all.  And so you don't even need to address the safe harbor in that circumstance.

But separate and apart, the other statements that may be forward, considered forward looking, the warnings that were given were both generic and also they warned of things that had already happened.  And so I think the warnings were something like people may choose not to use our products.  Well, what you can't do is give them warning, saying people may choose not to use our products, when you know that that's already been happening in the market.

But I think again, the strongest argument is to go back to that statement about engagement with the ecosystem.  That's not forward looking at all.

I just wanted to address Your Honor's point about

whether people knew about the Quo report.  And in paragraph 92 of the complaint, this is dealing with the fireside chat that happened a week after the Quo report, this is the benchmark company describing the chat, but they say it's the company's first opportunity to publicly discuss the recent sale side speculation of Nvidia ending the development of the X32.  So I take that as everyone saying, we'll be talking about today is the Quo report.  And there was an over 10 percent market reaction to the Quo report.  I don't have anything else unless.

THE COURT:  Okay.  Thank you.  Thank you for the information.  Really appreciate the briefing, both sides very well done, very helpful to the Court.  I'll go back through and dig into this and get something out on this very soon.

MR. WALKER:  Thank you, Your Honor.

THE COURT:  Thank you very much.

MS. BRODY:  Thank you, Your Honor.

THE COURT:  Thank you.

(Proceedings concluded at 10:24 a.m.)

* * * * *

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    October 18, 2025

        **Signed**                                                    **Dated**


*TONI HUDSON, TRANSCRIBER*