Exhibit 3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE SEMTECH CORP. SECURITIES LITIGATION

Case No. 2:25-cv-01474-MCS-JC

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT [ECF No. 54]**

Defendants Semtech Corporation, Hong Q. Hou, and Mark Lin filed a motion to dismiss Lead Plaintiff Luis Collazos's Consolidated Class Action Complaint. (Compl., ECF No. 51; Mot., ECF No. 54). Plaintiff filed an opposition to the motion, (Opp'n, ECF No. 58), and Defendants replied, (Reply, ECF No. 61). In support of their motion, Defendants filed a request for judicial notice of certain documents. (RJN, ECF No. 55.) Plaintiff filed an opposition to the request, (RJN Opp'n, ECF No. 59), and Defendants replied, (RJN Reply, ECF No. 62). The Court heard argument on the motion on September 22, 2025. (Mins., ECF No. 65.)

///

1

## I.    BACKGROUND

This is a securities fraud putative class action concerning allegedly false and misleading statements made between October 10, 2024, and February 7, 2025. (Compl. ¶¶ 1, 184.) Lead Plaintiff Luis Collazos alleges that Defendants made eight false and misleading statements about the market opportunity for Semtech's CopperEdge technology in an effort to drive up Semtech's stock price, despite knowing that those statements were false and misleading. (*Id.* ¶¶ 122, 124, 126, 129–30, 132, 134.) Defendants move to dismiss the consolidated complaint, arguing that each of the eight statements is not actionable under section 10(b) of the Securities Exchange Act. (Mot. 5–22.) In ruling on the motion, the Court takes as true the following facts from the consolidated complaint.

Semtech is a provider of "high-performance semiconductors, Internet of Things ('IoT') systems, and cloud connectivity service solutions." (Compl. ¶ 2.) One of Semtech's products is CopperEdge, an active copper cable ("ACC") technology. (*Id.* ¶ 4.) ACC technology "is used inside system racks linking computer servers to storage subsystems." (*Id.*)

In March 2024, the leading designer of graphics processing units, Nvidia, announced the arrival of its new GB200 Grace Blackwell Superchip platform, which promised to be one of the most powerful systems on the market. (*Id.* ¶ 5.) Nvidia planned to offer three configurations for the GB200 platform: the GB200 NVL36, the GB200 NVL72, and the GB200 NVL36x2. (*Id.*) The NVL36x2 configuration required ACC technology, like CopperEdge; the other two configurations did not. (*See id.*) The NVL36x2 configuration thus provided "the use case and market opportunity" for CopperEdge. (*Id.*) On a June 2024 earnings call, then-CEO Paul Pickle projected that Nvidia's NVL36x2 configuration provided a $50 million market opportunity for Semtech. (*Id.* ¶ 6.)

On October 1, 2024, an "influential analyst" named Ming-Chi Kuo published a report with the headline "Nvidia halting development of GB200 NVL36*2 (dual-rack

2

72 GPUs version)" (the "Kuo Report"). (*Id.* ¶ 11.) According to Kuo's reporting, Nvidia planned to offer only the NVL36 and NVL72 configurations, not the NVL36x2. (*Id.*) Shortly after the Kuo Report's publication, Semtech's stock price fell from over $45.66 on September 30 to $40.58 on October 3. (*Id.* ¶ 91.) According to the complaint, Defendants spent the next few months attempting to reassure investors that CopperEdge's market opportunity remained unchanged despite the Kuo Report's conclusions. (*See id.* ¶¶ 121–35.)

On October 8, 2024, Defendants Hong. Q. Hou, Semtech's CEO, and Mark Lin, Semtech's CFO, attended a virtual fireside chat with the Benchmark Company to discuss the "potential implications for Semtech's revenue" of Nvidia halting the NVL36x2. (*Id.* ¶ 92.) On October 10, Benchmark issued a report summarizing the call, which stated:

> Semtech has connected with its various cloud service provider customers, multiple supply chain contacts, cable vendors, and a variety of contacts within Nvidia's purchasing organization across multiple geographies, including its Supply Chain Director and Chief Rack Architect and the company has been unable to find any evidence of any changes to Nvidia program deployment plans . . . .

("Statement 1") (*Id.* ¶ 122 (ellipsis in original) (emphasis removed).)

Later that month, on October 22, 2024, Piper Sandler & Co. published a report after hosting an investor call with Semtech's management. (*Id.* ¶ 123.) The report stated that "CEO Hou reiterated [Semtech]'s ACC expectations" ("Statement 2"). (*Id.* ¶ 124 (emphasis removed).)

On November 25, 2024, Semtech hosted its Q3 Earnings Call, during which Defendants again tried to reassure investors that CopperEdge's market opportunity remained unchanged. (*Id.* ¶ 126.) Specifically, Hou made the following statements:

> We expect incrementally higher contribution in our Q4, followed by a ramp progressing through FY '26.

("Statement 3") (*Id.* (emphasis removed).)

3

> That said, allow me to provide some assurances based on our ecosystem engagement. We have invested time with our customer and end users of the racks over the past few months. We reaffirmed our expectation of exceeding the floor case provided a couple quarters ago based on the firsthand information from the ecosystem.

("Statement 4") (*Id.* (emphasis removed).)

> So that gives me the confidence that after the OCP that our floor case guided a couple of quarters ago is indeed a floor case.

("Statement 5") (*Id.* ¶ 129 (emphasis removed).)

On the same earnings call, in response to an analyst's question, Lin said, "So it's a nominal ramp in Q4, and then it progressively ramps through FY '26 through Q1, Q2, Q3, and Q4. So we've been pretty consistent with that messaging, and we don't really see a change in that timing" ("Statement 6"). (*Id.* ¶ 130 (emphasis removed).)

On January 11, 2025, Roth Capital Partners issued a report after discussions it had with Semtech management at a trade show. The report stated that "[m]gmt. continues to underscore . . . [e]xpansion above its prior $100M FY26 TAM . . . . In general, the ACC remains on track with NVDA's Blackwell" ("Statement 7"). (*Id.* ¶ 132 (emphasis removed).)

On January 21, 2025, Needham & Co. issued a report after hosting a conference with the management of a number of semiconductor companies, including Semtech, stating that "[m]anagement remains comfortable with its floor case ACC TAM of $100MM, noting it continues to be supported by one customer for one use case" ("Statement 8"). (*Id.* ¶ 134 (emphasis removed).)

According to Plaintiff, each of these eight statements was "materially false, misleading and omitted material facts" because at the time each statement was made, the speaker "knew or recklessly disregarded that Nvidia was discontinuing its NVL36x2 rack." (*E.g., id.* ¶ 123.) To support this argument, Plaintiff alleges that two of the largest potential customers for the GB200, Amazon and Oracle, had already announced their

intent to adopt the NVL72 configuration in March 2024. (*Id.* ¶ 87.) A third major potential GB200 customer, Microsoft, also announced its adoption of the NVL72 configuration on November 19. (*Id.* ¶¶ 97–98.) Multiple analysts also corroborated the Kuo Report after attending the 2024 Global Summit, an October 15 conference attended by representatives of over 1,400 market participants, where the analysts observed the widespread adoption of the NVL72 configuration. (*Id.* ¶¶ 94–96.)

According to Plaintiff, Defendants were incentivized to "delay the release of the bad news that Semtech's FY2026 ACC revenue opportunity had evaporated until after a planned December 2024" public stock offering. (*Id.* ¶ 146.) Plaintiff alleges that Semtech had incurred an "immense debt" stemming from its acquisition of another company in January 2023 for $1.2 billion, which it financed with $1.15 billion of debt. (*Id.* ¶¶ 3, 146.) This debt was proving to be an "existential threat" for Semtech, so Defendants "sought to maximize the funds raised in the December 2024 public offering by contradicting the Kuo Report just long enough to inflate Semtech's stock price and raise enough money to pay down a significant portion of their debt." (*Id.* ¶ 146.) The offering closed on December 9, 2024, and raised approximately $661 million, which Semtech used to lower its debt leverage ratio from 11.2x to 2.2x. (*Id.* ¶ 149.) Plaintiff further alleges that Lin was personally motivated to inflate Semtech's stock price to maximize his returns on trades prescribed by his previously adopted 10b5-1 trading plan. (*See id.* ¶¶ 151–55.) Pursuant to that plan, Lin sold 10,463 shares of Semtech stock through December 2024 and January 2025 for over $650,000 in profits. (*Id.* ¶¶ 152–53.)

On February 6, 2025, analysts from Robert W. Baird & Co. issued a note cutting Semtech's target stock price from $80 to $60 because they had observed "slower-than-expected uptake of Semtech's active copper cables" and warning investors to "brace for near-term turbulence." (*Id.* ¶ 136 (internal quotation marks omitted).) The next day, Semtech filed a Form 8-K with the SEC announcing that CopperEdge's net sales were "expected to be lower than [Semtech]'s previously disclosed floor case of $50 million

5

due to rack architecture changes, with no expected ramp-up over the course of fiscal year 2026." (*Id.* ¶ 139 (internal quotation marks omitted).) Shortly thereafter, on February 10, Semtech's stock price fell to $37.60, a drop of nearly 38% from the $60.50 stock price four days earlier. (*Id.* ¶ 141.)

## II.    REQUEST FOR JUDICIAL NOTICE

In support of their motion to dismiss, Defendants request that the Court take judicial notice of, or deem incorporated by reference, 13 exhibits. (*See* RJN 1–4.) Plaintiff opposes the request as to exhibits 2, 4, 5, and 14. (RJN Opp'n 1.) Plaintiff does not dispute that the remaining exhibits can be considered by the Court under the judicial notice or incorporation by reference doctrines, so long as they are only considered for their existence, rather than for the truth of the matters asserted therein or to dispute the factual allegations of the complaint. (*Id.*) In their reply in support of their requests, Defendants ask the Court to consider two additional exhibits. (RJN Reply 6–7, ECF No. 62.)

Defendants ask the Court to consider the following exhibits:

- **Exhibit 2**: Undated article, "Understanding Your Grace-Blackwell Systems"
- **Exhibit 3**: October 1, 2024, article, "Nvidia halting development of GB200 NVL 36*2 (dual-rack 72 GPUs version); long-term AI and Nvidia trends remaining positive, but frequent product plan changes likely softening short-term trading sentiment"
- **Exhibit 4**: January 7, 2025, article, "Nvidia says Blackwell-based servers are in full production-200 different configurations now available"
- **Exhibit 5**: Transcript of January 6, 2025, speech by Nvidia CEO
- **Exhibit 6**: October 10, 2024, analyst report, "Semtech Corporation (SMTC)"
- **Exhibit 7**: October 22, 2024, analyst report, "Semtech Corp. (SMTC) Takeaways from Management Deep Dive on Data Center Opportunities"
- **Exhibit 8**: January 11, 2025, analyst report, "Semtech Corp."

6

- **Exhibit 9**: January 21, 2025, analyst report, "Semiconductors, Processors/AI"
- **Exhibit 10**: Transcript of November 25, 2024, Semtech earnings call
- **Exhibit 11**: November 25, 2024, press release, "Semtech Announces Third Quarter of Fiscal Year 2025 Results"
- **Exhibit 12**: November 25, 2024, quarterly earnings presentation
- **Exhibit 13**: March 28, 2024, SEC Form 10-K
- **Exhibit 14**: August 12, 2024, SEC Form 13-F
- **Reply Exhibit 1**: February 7, 2025, SEC Form 8-K
- **Reply Exhibit 2**: November 26, 2024, SEC Form 8-K

A court may take judicial notice of a fact not subject to reasonable dispute because it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A document may be deemed incorporated by reference into a pleading "if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). In securities fraud cases, the Ninth Circuit has instructed courts to cautiously approach overreliance on extraneous materials at the pleading stage:

> The overuse and improper application of judicial notice and the incorporation-by-reference doctrine . . . can lead to unintended and harmful results. Defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage. Yet the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access.

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

The Court considers exhibits 3 and 6–10 under the incorporation by reference doctrine, but not to the extent they are proffered to "resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Id.* at 1014; (*see also* RJN Opp'n 11 (conceding these exhibits can be considered under the incorporation by reference doctrine)). The Court also takes judicial notice of exhibits 11–13, but not the disputed facts contained within them. *Khoja*, 899 F.3d at 999 (observing that a "court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment," "[b]ut a court cannot take judicial notice of disputed facts contained in such public records").

Defendants offer the first challenged exhibit, exhibit 2, to "illustrate publicly available information regarding Nvidia's NVL 36x2 rack configuration." (RJN 2; RJN Ex. 2, ECF No. 56-2.) Defendant's motion only cites the exhibit for an exemplary image of the NVL36x2 configuration. (*See* Mot. 3.) The image appears to be offered only for illustrative purposes rather than to support any of Defendants' substantive arguments. The Court accordingly does not need to consider the exhibit or image in adjudicating the motion and thus denies the request for judicial notice as unnecessary. *See Japanese Vill., LLC v. Fed. Transit. Admin.*, 843 F.3d 445, 454 (9th Cir. 2016).

The next challenged exhibits, exhibits 4 and 5, contain the transcript of a speech delivered by Nvidia's CEO and an article published the following day detailing the speech. (RJN 2–3; RJN Exs. 4–5, ECF Nos. 56-4 to -5.) Defendants also offer these exhibits to "demonstrate the publicly available information regarding the NVL36x2" configuration. (RJN 3.) While it is generally true that Courts can take judicial notice of publicly available articles and reports to "indicate what was in the public realm at the time," *Van Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (internal quotation marks omitted), Defendants appear to cite these exhibits to undermine Plaintiff's allegations that the NVL36x2 configuration had been discontinued and that Defendants were aware of that fact. (Mot. 4.) At the motion to dismiss stage, the only question is whether Plaintiff has adequately pleaded the elements

8

of security fraud, not whether fraud is ultimately provable. *See Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1023 (C.D. Cal. 2015) (declining to take judicial notice of documents at the motion to dismiss stage where defendants "confuse[d the plaintiff's] obligation to plead plausible claims with her ability to prove those claims"). Because Defendants offer these documents to challenge the truth of Plaintiff's factual allegations, the Court declines the request for judicial notice as to these documents.

Defendants next ask the Court to take judicial notice of an SEC Form 13-F filed by Lion Point Capital on August 14, 2024, to "provid[e] context relevant to Plaintiff's allegations related to Lion Point Capital." (RJN 4; RJN Ex. 14, ECF No. 56-14.) Plaintiff alleges that Lion Point is an "activist investor" that acquired a 3.8% stake in Semtech and aimed to reduce Semtech's debt. (Compl. ¶ 3.) As part of an agreement with Semtech, Lion Point selected Hou to join Semtech's board of directors. (*Id.* ¶ 7.) Defendants only cite exhibit 14 to show that "Lion Point did not hold any company stock at the time the challenged statements were made." (Mot. 19 n.5.) According to Defendants, this is relevant to Plaintiff's claims of motive. (RJN Reply 5.) Lion Point is not a defendant in this action, so whether or not Lion Point had a motive to drive up Semtech's stock price is not relevant to this motion. Since the Court can adjudicate the motion without considering the exhibit, the Court denies the request for judicial notice as to this exhibit. *See Japanese Vill.*, 843 F.3d at 454.

Finally, in their reply brief, Defendants request that the Court take judicial notice of two additional exhibits that were not included in their original request. (*See* RJN Reply 6–7.) Because these requests were filed for the first time in a reply brief, the Court declines to consider them.[1] *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

---

[1] The Court notes that consideration of these two exhibits would not change the disposition of the motion.

In all, the request for judicial notice is granted in part and denied in part. The Court takes judicial notice of exhibits 11–13 and deems exhibits 3 and 6–10 incorporated by reference into the complaint. The Court declines to consider the remaining exhibits.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

"[C]laims under section 10(b) and Rule 10b-5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act" ("PSLRA"). *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action."). Under Rule 9(b), Plaintiffs must "state with particularity the circumstances constituting fraud or

mistake." Fed. R. Civ. P. 9(b). The complaint must identify the "who, what, when, where, and how" of the fraudulent misconduct, "as well as what is false or misleading about" it, and "why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted).

## IV. DISCUSSION

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements section 10(b) by declaring it unlawful:

a. To employ any device, scheme, or artifice to defraud,

b. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

c. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413 (9th Cir. 2020). To state a claim under section 20(a), a plaintiff must adequately allege: (1) a primary violation of federal securities laws, and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Thus, if the underlying primary violation of federal securities law is insufficiently alleged, the section 20(a) claim fails

11

as well. *Nguyen*, 962 F.3d at 419.

Defendants argue that Plaintiff's claims under section 10(b) and Rule 10b-5 fail because they are premised on third party statements that are not attributable to Defendants, the statements fall within the PSLRA's safe harbor for forward-looking statements, and the complaint contains inadequate allegations to establish an inference of falsity or scienter under the heightened pleading requirements of Rule 9(a) and the PSLRA. Defendants further argue that Plaintiff's claims under section 20(a) fail because Plaintiff has not adequately pleaded any predicate violation of the securities laws.

### A.    Third-Party Analyst Statements

Defendants first argue that Statements 1, 2, 7, and 8 are not actionable under section 10(b) because they are statements by third-party analysts, not Defendants. (Mot. 5–7.) Section 10(b) liability attaches only to the "maker" of a statement. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). "[T]he maker of a statement is the person or entity with ultimate authority over the statement . . . ." *Id.* Defendants can be liable for statements contained in third-party analysts' reports when the "statements in [the] analysts' reports clearly originated from the defendants." *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020) (quoting *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004)).

Plaintiff has not alleged that Defendants had any control over what each analyst included in their reports. Without such an allegation, the complaint fails to raise an inference that anyone but the analysts are the "makers" of the challenged statements. *See Janus*, 564 U.S. at 142.

Defendants could, however, still be liable for the statements that they themselves made to the analysts. *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1051–52 (N.D. Cal. 2007) (holding statements in an analyst report were not actionable

12

under section 10(b) because none "appear[ed] to be a repeat of what management actually said" to the analyst). The complaint, however, does not include allegations attributing the challenged statements to Defendants. For example, Statement 1 comes from a report by the Benchmark Company "summarizing" a fireside chat with Hou and Lin. (Mot. 6; Compl. ¶ 122.) The complaint does not allege what Defendants actually said during that conversation that led the Benchmark Company to include certain statements in its summary. Indeed, Plaintiff's counsel conceded at the September 22, 2025, hearing on this motion that they did not have a transcript of the call. Because the complaint does not specify what Defendants said to any of the analysts, the current allegations are insufficient under Rule 9(b) and the PSLRA's heightened pleading requirements. *See In re LeapFrog*, 527 F. Supp. 2d at 1051–52; *Cafasso*, 637 F.3d at 1055 (holding that a complaint sounding in fraud must allege the "who, what, when, where, and how" of the allegedly fraudulent conduct).

Statements 1, 7, and 8 suffer from the additional problem that Plaintiff has not alleged the identity of their speakers. Statements 7 and 8 only refer to things "management" said, and Statement 1 refers to Hou and Lin collectively. (*See* Compl. ¶¶ 122, 132, 134.) Plaintiff is generally correct that that under traditional agency principles, statements by management can be attributed to a company as the principal. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476–77 (9th Cir. 2015) (holding that an officer's scienter can be imputed to the corporation). But that general rule does not negate the heightened pleading requirements of Rule 9(b) and the PSLRA. Plaintiff still needs to allege *who* the speaker-agent is with particularity. *See Cafasso*, 637 F.3d at 1055; *see also In re Hanson Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153–54 (C.D. Cal. 2007) (holding that the "group pleading doctrine did not survive the PSLRA").

In sum, the complaint does not raise an inference that anyone but the analysts are the makers of Statements 1, 2, 7, and 8. Moreover, to the extent Plaintiff asserts that Statements 1, 7, and 8 are attributable to Defendants, Plaintiff has not alleged with

13

sufficient particularity what was said by which Defendants to which analysts. The motion is therefore granted as to these four statements.

### B.    November 25, 2024, Earnings Call

The remaining statements, Statements 3–6, all come from Semtech's Q3 earnings call on November 25, 2024. (Compl. ¶¶ 126, 129, 130.) Defendants argue these statements fall within the PSLRA's safe harbor for forward-looking statements and are inadequately pleaded. (Mot. 7–22.)

### 1.    The PSLRA Safe Harbor

Under the PSLRA, a defendant is not liable for a statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(*i*). "The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010); *see also Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1134 (S.D. Cal. 2012) ("[B]oilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning." (alteration in original) (internal quotation marks omitted)), *aff'd sub nom. Fresno Cnty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015). "[T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts." *In re Quality Sys.*, 865 F.3d at 1142. Similarly, the safe harbor is

14

not "designed to protect [defendants] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Id.*

Defendants argue that "[a]ll of the challenged statements on the November 25, 2024 earnings call" fall within the safe harbor because they "were forward-looking statements concerning financial projections, future economic performance, and the assumptions related to these issues." (Mot. 14.) At the beginning of the earnings call, Lin stated:

> Today's call will include various remarks about future expectations, plans, and prospects, which comprise forward-looking statements. Please refer to today's press release and see Slide 2 of the earnings presentation, as well as the Risk Factors section of our most recent annual report on Form 10-K for information on risk factors that could cause our actual results to differ materially from those made on this call.

(RJN Ex. 10, at 4.)

The referenced slide in the earnings call presentation elaborated upon the "[p]otential factors that could cause actual results to differ materially from those" made during the call. (RJN Ex. 12, at 2.) The warning specifically referenced the risk of "competitive changes in the marketplace including, but not limited to, the pace of growth or adoption rates of applicable products or technologies." (*Id.*) This mirrors the cautionary language that has been held sufficient to trigger the safe harbor in other cases. *See*, *e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 20214) ("Before we begin, I would like to inform you that comments mentioned on today's call may be deemed to contain forward-looking statements. Actual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties."). Since the warning here conveyed substantive information about specific risks, the cautionary language was sufficient to trigger safe harbor protections.

Because the cautionary language is sufficient, the statements are not actionable

15

if they are forward looking within the meaning of the safe harbor. An "earnings projection is by definition a forward-looking statement." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). "[S]tatements that a company 'expects,' 'believes,' or 'is confident' that certain projections will be realized in the future" are also forward looking. *In re Arrowhead Pharms., Inc. Sec. Litig.*, No. CV 16-08505 PSG-PJW, 2017 WL 5635422, at *4 (C.D. Cal. Sept. 20, 2017) (collecting cases). Statements 3 and 6 both concern Semtech's projections of CopperEdge's demand and sales over the coming quarters. (Compl. ¶¶ 126, 130.) They are thus projections about what Semtech expected "will be realized in the future" and fall within the safe harbor. *See In re Arrowhead*, 2017 WL 5635422, at *4.

Statements 4 and 5, however, do not involve forward-looking projections. Instead, these statements are claims about Semtech's ongoing belief in the continued viability of the NVL36x2. Hou stated that Semtech management had "invested time with [their] customer and end users of the racks over the past few months," which "reaffirmed [their] expectation of exceeding the floor case." (Compl. ¶ 126 (emphasis removed).) Whether management had actually engaged with consumers and end users and concluded that NVL36x2 was still viable is a statement of past or current fact, not forward looking. Similarly, Hou's statement that he had "confidence that after the OCP that [Semtech's] floor case guided a couple of quarters ago is indeed a floor case" was based on his preceding statements about his observations of end users' adoption trends of different configurations, including NVL36x2. (*Id.* ¶ 129 (emphasis removed).) These are both statements of "current or present facts" that do not fall within the safe harbor. *See In re Quality Sys.*, 865 F.3d at 1142.

As pleaded, Statements 3 and 6 fall within the PSLRA's safe harbor, but Statements 4 and 5 do not. The motion is therefore granted as to Statements 3 and 6.

///

16

2. Falsity

Defendants next argue that Plaintiff has not pleaded sufficient facts showing that the remaining statements, Statements 4 and 5, were false or misleading when made. (Mot. 7–13.) Under the PSLRA, "falsity" is any "untrue statement of a material fact." 15 U.S.C. § 78u-4(b)(1). "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks omitted). "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). A plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at 1061 (quoting 15 U.S.C. § 78u-4(b)(1)).

Plaintiff has pleaded enough facts to create an inference that Statements 4 and 5 were false when Hou made them. In both statements, Hou asserted that NVL36x2 was still viable, so CopperEdge's market opportunity was unchanged. (*See* Compl. ¶¶ 126, 129.) Plaintiff points to a number of facts indicating that this was not true at the time of the November 25, 2024, earnings call. Plaintiff primarily invokes the October 1, 2024, Kuo Report that said Nvidia was halting development of the NVL36x2, which was then corroborated by the observations of other analysts at the 2024 Global Summit on October 15. (Compl. ¶¶ 89, 94–96.) Moreover, three of the GB200's major end users, Oracle, Amazon, and Microsoft, had already announced that they would be using the NVL72 configuration, not the NVL36x2. (*Id.* ¶¶ 87, 98.) All of these facts support an inference that Hou's statements on the November 25, 2024, earnings call were false when he made them. This conclusion is further supported by the allegation that Rockell Hankin, a Semtech board member of 27 years, 18 of which he spent as chairman, abruptly resigned after the earnings call. (Compl. ¶¶ 18, 128); *cf. Brown v. China*

17

*Integrated Energy Inc.*, 875 F. Supp. 2d 1096, 1116 n.78 (C.D. Cal. 2012) ("While it is correct that resignations themselves are not indicative of falsity, the allegations concerning KPMG's resignation suggest that at least that firm had doubts concerning management's representations to KPMG in connection with the 2010 audit and evaluation of internal controls." (internal quotation marks omitted)).

In all, Plaintiff has pleaded enough facts to create an inference that Statements 4 and 5 were false when Hou made them.[2]

### 3.    Scienter

Defendants' final argument is that Plaintiff has not adequately pleaded the scienter element. (Mot. 17–22.) "[T]o state a claim for securities fraud that complies with the dictates of the PSLRA, the complaint must raise a 'strong inference' of scienter—*i.e.*, a strong inference that the defendant acted with an intent to deceive, manipulate or defraud." *Metzler Inv.*, 540 F.3d at 1061 (quoting 15 U.S.C. § 78u-4(b)(2)). A plaintiff can establish scienter "by showing deliberate recklessness or 'some degree of intentional or conscious misconduct.'" *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016) (quoting *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)). "'Deliberate recklessness is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading . . . that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (alteration in original) (internal quotation marks omitted). The PSLRA requires that the inference of scienter

---

[2] Defendants make a number of factual arguments to undermine Plaintiff's position that Hou's statements on the earnings call were false or misleading when he made them. (*See* Reply 1–2 (arguing that the Kuo Report was "unsourced" and thus less credible, criticizing Plaintiff for not having a confidential witness or internal Semtech document supporting his theory, and claiming that one end user, Meta, had adopted the NVL36x2).) These are factual issues unsuitable for resolution on a motion to dismiss.

18

be "strong," and that the Court "take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007) (internal quotation marks omitted). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

To establish a strong inference of scienter, Plaintiff primarily points to Semtech's significant debt position that it substantially solved with a stock offering in December 2024.[3] (*See* Compl. ¶¶ 145–50.) "[A] plausible financial motive for Defendants to lie" raises an inference of scienter. *In re Sona Nanotech Inc. Sec. Litig.*, No. 2:20-cv-11405-MCS-MAA, 2022 U.S. Dist. LEXIS 49167, at *4 (C.D. Cal. Mar. 18, 2022) (Scarsi, J.); *see also Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021). Plaintiff alleges that by 2024, Semtech's debt had become an "existential threat," and Defendants "sought to delay the release of the bad news that Semtech's FY2026 ACC revenue opportunity had evaporated until after a planned December 2024 public offering of stock." (Compl. ¶ 146.) Plaintiff alleges that the plan was successful: the offering raised approximately $661 million, and Semtech's debt leverage ratio decreased from 11.2x to 2.2x. (*Id.* ¶ 149.)

Not only does Plaintiff raise a plausible inference that Defendants had a financial motivation to lie, but Plaintiff also alleges that Semtech management quickly changed their public statements after the successful stock offering in December 2024. (*See* Compl. ¶¶ 139, 150.) A "close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure may bolster an inference of scienter." *In re*

---

[3] Plaintiff also argues that Lin's personal stock sales throughout December 2024 and January 2025 support a strong inference of scienter. (Opp'n 18–20.) Because the only statements remaining at this point in the analysis were made by Hou, the Court does not address the arguments supporting Lin's scienter.

*Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020). Hou made the statements on the November 25, 2024, earnings call two weeks before the December 9, 2024, stock offering, and about ten weeks before Semtech filed a Form 8-K in February 2025 with the SEC announcing that CopperEdge's net sales were "expected to be lower than [Semtech]'s previously disclosed floor case of $50 million due to rack architecture changes, with no expected ramp-up over the course of fiscal year 2026." (Compl. ¶ 139 (internal quotation marks omitted).) The short period between the earnings call statements, the stock offering, and the eventual changed projection supports an inference of scienter.

The inference is further supported by the sudden resignation of long-time Semtech board member Rockell Hankin. (Compl. ¶¶ 18, 128); *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (holding that a resignation can support an inference of scienter if the resignation is "uncharacteristic when compared to the defendant's typical hiring and termination patterns or [is] accompanied by suspicious circumstances"). Hankin's resignation, after decades at Semtech, without notice and less than two weeks before a stock offering that promised to make Semtech millions of dollars, is suspicious. While this likely would not be enough to establish an inference of scienter on its own, it is just one of the factual circumstances that Plaintiff has alleged to support such an inference. *See Tellabs*, 551 U.S. at 326 (instructing courts to assess scienter allegations "holistically," rather than "scrutinize each allegation in isolation"). Looking at Plaintiff's allegations together, he has met his burden to establish a strong inference of scienter at the pleading stage.

Defendants argue that "generic financial motivations" like reducing debt cannot support an inference of scienter. (Mot. 19.) "[A]llegations of routine corporate objectives such as the desire to obtain good financing and expand are not, *without more*, sufficient to allege scienter." *In re Rigel Pharms.*, 697 F.3d at 884 (emphasis added). As explained above, Plaintiff has alleged more than a mere desire to solve the debt problem. The tight timeline between the earnings call statements, the stock offering,

and the February 2025 8-K, along with Hankin's sudden resignation, all support an inference of scienter.

In all, Plaintiff has met his burden to allege facts creating a strong inference that Hou acted with scienter when he made the statements on the November 25, 2024, earnings call.[4] The motion is therefore denied as to Statements 4 and 5.

### C.    Section 20(a) Control Person Claims

Defendants argue that the section 20(a) control person liability claims against Hou and Lin should be dismissed because Plaintiff has not adequately pleaded a primary violation of securities laws. (Mot. 22.) Because the Court has concluded that Plaintiff has adequately pleaded a predicate offense as to Statements 4 and 5, which were both made by Hou, the motion to dismiss the section 20(a) claim is denied as to Hou. However, Plaintiff has not adequately pleaded any securities law violations by Lin. The section 20(a) claim is therefore dismissed as to Lin.

### D.    Leave to Amend

Leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek*

---

[4] Defendants further argue that the earnings call statements are not actionable because they are opinion statements. (Mot. 16–17.) Opinion statements can be actionable as material misrepresentations if "'the speaker did not hold the belief she professed' and . . . the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 185–86 (2015)). Because the Court concludes Plaintiff has adequately pleaded that Statements 4 and 5 were false when Hou made them, and that Hou knew of or recklessly disregarded their falsity, the Court also concludes that Plaintiff has met his burden to plead that these statements are actionable even though they may be opinion statements. Defendants also argue that Statement 7 is non-actionable corporate puffery. (Mot. 17.) Because the Court grants the motion as to Statement 7 on the ground that it is a non-actionable third-party statement, the Court does not reach the puffery argument.

*v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). While some of the defects in the complaint appear to be curable, the Court doubts that pleading additional facts will cure other defects, such as the application of the PSLRA safe harbor to Statements 3 and 6, without running afoul of Rule 11(b). Notwithstanding, given the Ninth Circuit policy of granting leave to amend with "extreme liberality," *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (internal quotation marks omitted), to the extent Defendants' motion is granted, it is granted with leave to amend.

## V.    CONCLUSION

The motion is granted in part and denied in part. Statements 1–3 and 6–8, as currently pleaded, are insufficient to support a claim for securities fraud under section 10(b) and Rule 10b-5. Statements 4 and 5 survive. Because Statements 4 and 5 were both made by Hou, the section 20(a) claim against him also survives. The section 20(a) claim against Lin is dismissed.

Plaintiff may file an amended complaint within 14 days—if he can do so consistent with Federal Rule of Civil Procedure 11(b) and this order. Plaintiff shall attach to the amended complaint a "redline" version showing all additions and deletions of material. (Initial Standing Order § 13, ECF No. 9.) Leave to add new claims, theories of the claims, or parties must be sought by a separate, properly noticed motion. Failure to file a timely amended complaint will waive the right to do so.

**IT IS SO ORDERED.**

Dated: October 7, 2025

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

22